IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 1, 2016

## LAMONT JOHNSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Gibson County**
**No. 8954      Clayburn Peeples, Judge**
_____

**No. W2016-00090-CCA-R3-PC- Filed November 30, 2016**
_____

The petitioner, Lamont Johnson, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial.  After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Anna Banks Cash, Jackson, Tennessee, for the appellant, Lamont Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Garry G. Brown, District Attorney General; and Hillary Lawler Parham and Jason Scott, Assistant District Attorney Generals, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In 2010, a Gibson County jury found the petitioner guilty of first degree murder in the perpetration of aggravated child abuse for the death of his five-month-old daughter. The petitioner was sentenced to life with the possibility of parole, and he appealed.  On direct appeal, this Court summarized the factual and procedural history of the petitioner's case as follows:

On March 1, 2010, the [petitioner] was indicted on one count of first degree felony murder in violation of Tennessee Code Annotated section 39-

13-202. The indictment alleged that the [petitioner] unlawfully killed the five-month-old victim during the perpetration of aggravated child abuse. The charges stemmed from activity that occurred on July 8, 2009.

At 12:33 p.m. on that date, the [petitioner] called 911 and reported that the victim was not breathing. When EMTs arrived at the scene, they observed the [petitioner] and a lifeless infant on the floor. The EMTs immediately began CPR and transported the victim to the hospital. An emergency room physician and the hospital's staff attempted pediatric lifesaving procedures for approximately one hour before the victim was declared dead.

The victim's autopsy revealed that she had died of multiple blunt force injuries to her head, chest, and abdomen. Based on a timeline provided by the [petitioner] and the victim's mother, investigators concluded that only the [petitioner] and his son were at home with the victim when the injuries occurred. When confronted with the autopsy findings, the [petitioner] claimed to investigators that the victim had stopped breathing after she had fallen off of a sofa. However, experts at the [petitioner's] trial later opined that the victim's injuries were not consistent with her having fallen off of a sofa and could not have been caused by the administration of CPR. One expert opined that the victim's injuries-which included retinal detachment, massive internal bleeding, a front-to-back skull fracture, and multiple rib fractures-could only have been caused by "extraordinarily violent" shaking that "would be very frightful to someone who was watching it."

At the [petitioner's] trial on December 12-13, 2011, the defense predicted in its opening statement that the prosecution's witnesses would not tell "the whole story" concerning the incident and stated its confidence that after considering all of the evidence the jury would feel compelled to return with a verdict of not guilty. At no point during that statement was any reference made to the [petitioner's] eight-year-old son. However, during the defense's cross-examination of the State's penultimate witness, the victim's mother, defense counsel asked questions apparently intended to cast suspicion upon the boy.

During her direct testimony, the victim's mother testified that she and her children were living together and that the [petitioner] had been in the process of moving in with them when the incident occurred. She also gave testimony about the events that transpired at the hospital following the

-2-

incident, and she related her grief when she learned that her daughter had died. She testified concerning the [petitioner's] behavior on the day of the incident and on the following day, which involved fainting, drinking, smiling, and laughing at various points. She described the couple's initial interviews with the police after the victim's death was ruled a homicide. She testified that prior to the police investigation, the [petitioner] had never mentioned anything to her about the victim having fallen off of a sofa. She testified that she first learned that the [petitioner] was making such a claim from the investigating officers.

During the victim's mother's cross-examination, however, the defense focused almost exclusively on the witness's feelings concerning the [petitioner's] son. The victim's mother testified that the [petitioner's] son lived nearby with his mother and that he would frequently come over to her house to spend the night. The victim's mother acknowledged that she had seen the [petitioner's] son hold the victim in the past. The victim's mother admitted that she had asked one of the investigators if the [petitioner's] son had been anywhere around the victim on the day of the incident. The victim's mother also testified that the [petitioner's] son had been in lots of trouble at school, had "all sorts of problems" with fighting and violence, and that she was "[j]ust a little bit" concerned about the [petitioner's] son being around her children.

After this testimony, the State's final witness, an investigating officer, testified concerning the investigation generally and discussed a statement given by the [petitioner] to police, in which he claimed to have left the victim on a living room sofa while he made her a bottle and that she fell on the floor, "crying loudly," when he came back in. The witness testified that the [petitioner] claimed to have noticed that the victim was having difficulty breathing shortly afterward.

During cross-examination, defense counsel questioned the witness concerning the degree to which the [petitioner's] son had been investigated as a possible suspect. The witness replied that the [petitioner's] son had undergone a "forensic interview." The witness testified that the [petitioner's] son had told them that he had been in the back bedroom playing video games throughout the relevant time period and that he had not seen anything that had transpired. Defense counsel asked the witness if he had spoken to anyone at the [petitioner's] son's school concerning the [petitioner's] son's reputation as a bully, and the witness replied, "No sir."

-3-

At this point, the record reflects that a bench conference was held, but the conference was not recorded.

Following this testimony, the State rested. Before the defense began its case the following morning, the State made an oral "objection" in response to the defense's apparent intent to offer character evidence concerning the [petitioner's] son. The State argued that presenting such evidence was "prohibited by the law and prohibited by the rules" if it was offered for purposes of showing that the child acted in conformity with some particular character trait on the day in question. The defense responded that it intended to introduce the testimony of four of the [petitioner's] son's teachers concerning the [petitioner's] son's "general conduct," as well as some of the [petitioner's] son's "specific acts," such as "threatening to kill students" and "saying he was going to harm students" with various objects that he had brought to school. The defense claimed that it was entitled to show to the jury that "this is perhaps an extraordinary child" and that the proffered evidence fell under one of the exceptions to the general prohibition against character evidence imposed by Tennessee Rule of Evidence 404(b). The State argued that Rule 404(b) only applied to defendants in a criminal case, not other witnesses, and consequently the evidence was not admissible.

The trial court asked the defense if any proof had been presented that the [petitioner's] son had committed the crime. The defense responded that it only wanted to prove that the [petitioner's] son had the "opportunity and capacity" to commit the crime. The trial court agreed that the [petitioner] had "an absolute right to present any evidence that someone else committed the crime," but disagreed that the [petitioner] had the right to present evidence that proved only that someone else was merely "capable of committing the crime." The trial court concluded by stating "I'm going to grant the State's motion."

After the State's "motion" was granted, the [petitioner] was advised of and waived his right to testify in his own defense pursuant to the procedures established in *Momon v. State,* 18 S.W.3d 152, 162-63 (Tenn. 1999), and the defense rested without putting on any proof. During closing arguments, the defense discussed the prosecution's failure to prove the identity of the perpetrator and briefly mentioned the [petitioner's] son as a possible alternative suspect. However, the defense primarily argued that the prosecution had failed to "connect all the dots" and prove its case beyond a reasonable doubt.

After being duly instructed, the jury retired to deliberate at 10:42 a.m. on December 13, 2011, and returned with a verdict finding the [petitioner] guilty as charged at 11:37 a.m. that same day. The [petitioner] was sentenced to life in prison. The [petitioner] filed a timely motion for new trial and an amended motion. The trial court denied the motion. The [petitioner] filed a timely notice of appeal.

With his amended motion for new trial, the [petitioner] filed four affidavits from the [petitioner's] son's former school teachers discussing the [petitioner's] son's behavior at school. These affidavits generally describe the [petitioner's] son's adoption of the "gangster" lifestyle and propensity toward sudden outbursts of violence, as well as his habit of fighting, using profanity, and issuing death threats. One mentions an incident in which the police had to be called to the [petitioner's] son's school "to get [the [petitioner's] son] under control." Another opines that "[w]ithout a doubt, it is my opinion that [the [petitioner's] son] had the capacity to hurt another child (or baby) seriously." The teachers generally claim that they would have testified in a manner consistent with their affidavits had they been permitted to do so at the [petitioner's] trial.

*State v. Lamont Johnson*, No. W2012-01271-CCA-R3-CD, 2013 WL 2404057, at *1-3 (Tenn. Crim. App. May 30, 2013) (footnotes omitted). After its review, this Court upheld the rulings of the trial court, noting the petitioner's "right to mount a defense" was not violated by the trial court's exclusion of character evidence of the petitioner's son's violent propensities. *Id.* at 6.

Subsequently, the petitioner filed a *pro se* petition for post-conviction relief. The trial court appointed present counsel who filed a supplemental brief alleging nine deficiencies in trial counsels' performance.[1] Specifically, the petitioner contends trial counsel: (1) failed to properly cross examine the State's expert witnesses, Dr. Miguel Laboy and Dr. Lisa Piercey; (2) failed to object to references of "shaken baby syndrome;" (3) failed to file a motion *in limine* regarding the petitioner's prior convictions, thus affecting his decision not to testify; (4) failed to obtain a medical expert for the defense; (5) failed to request a hearing on the defense motion for a speedy trial; (6) failed to thoroughly investigate and question the victim's mother regarding prior injuries to the victim, including allegedly dropping the victim prior to her death; (7) failed to file a motion to suppress the petitioner's recorded statement; (8) failed to

---

[1] The petitioner was represented by two attorneys at trial, the District Public Defender and an assistant public defender.

produce a potential key defense witness, Latoya Love, the victim's mother's cousin; and (9) failed to call the petitioner's son as a witness.

The petitioner testified at the post-conviction evidentiary hearing. He also presented evidence from Dr. Laboy and trial counsel from the District Public Defender's office. The post-conviction court summarized the evidence produced at the hearing, as follows:

Dr. Miguel Laboy testified as to his finding of the autopsy in this matter. He stated that the child died as a result of blunt force trauma. He testified that there were no bruises on the child other than a healing abrasion on the left forearm. He testified that the injuries could have occurred up to two (2) hours prior to the death of the child. He testified that he did not classify this as a "shaken baby syndrome" case, but that the child died of blunt force trauma. Dr. Laboy testified that the child had healing fractures of her ribs, as well as, "re-breaks."

[The Public Defender] testified that they did not get an outside opinion from a medical expert, but that he did do internet research and possibly did speak to Dr. Lisa Piercey. He also testified that he spoke with the [petitioner] in general about his right to testify and that [the public defender's investigator] went to the jail to do a mock cross examination with the [petitioner] to see whether the [petitioner] would get "tripped up" during cross examination. [The Public Defender] then testified that it was after this mock cross examination that they discussed that the [petitioner] didn't want to testify after a fear that he would open the door to allow the State to cross examine him on prior convictions of Domestic Assault. During cross examination, [the Public Defender] testified that he was allowed to put the [petitioner] on the stand prior to the close of their proof and voir dire him about his desires to testify. The [petitioner] during this examination stated on the record that he understood it was his right to testify and that if he chose not to testify, the jury would be instructed not to draw any inferences; that no one could prevent him from testifying and that he had consulted his attorneys and had been advised of the advantages and disadvantages of taking the stand. [The Public Defender] testified that he was surprised by the answer of [the investigating officer] when asked on cross examination if [the petitioner's son] was eliminated as a suspect because he didn't consider conducting a forensic interview "eliminating" the child as a suspect. However, on cross examination, [the Public Defender] did testify that the [investigating officer] quoted the forensic interview and he quoted the statement of [the petitioner's son] correctly.

-6-

[The assistant public defender] testified that [the public defender's investigator] talked with most of the witnesses prior to trial at her direction. She also testified that [the Public Defender] conducted the cross examination of [the investigating officer].

Lamont Johnson, the [p]etitioner, then testified that [the assistant public defender] had filed a Motion for a Speedy Trial on September 27, 2010, but that his trial wasn't until December 12, 2011. He also testified that he felt that Brittany Short, the children's mother, was responsible for the old injuries and that his lawyer failed to cross examine her. He testified that he had not been around the children much, until three to four weeks prior to the death of [the victim]. He also testified that Latoya Love said in her statement that [the victim] was a happy baby. He contended that [the victim] could not have been a happy baby because she could have had broken ribs up to four weeks prior to her death. None of these witnesses: Brittany Short, Latoya Love or [the petitioner's son] were presented to the [c]ourt. The [p]etitioner then contended that the action of the prosecutor during closing arguments by tearing the picture of the children apart was inflammatory and that counsel should have objected.

After its thorough review of the evidence presented, the post-conviction court denied relief to the petitioner finding he failed to prove ineffective assistance of trial counsel by clear and convincing evidence. This appeal followed.

## ANALYSIS

On appeal, the petitioner generally alleges he was unable to present a "complete defense" based on three proffered deficiencies of trial counsel.[2] First, the petitioner asserts trial counsels' failure to present a medical expert in its defense was unreasonable. He next argues trial counsel failed to properly cross-examine Dr. Laboy and Dr. Piercey. Finally, the petitioner claims trial counsel failed to appropriately address an alleged misstatement in the investigating officer's testimony. The State asserts the petitioner's claims are meritless. After our review, we agree with the State.

The petitioner bears the burden of proving his post-conviction allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). The findings of fact

---

[2] This Court will only address the issues briefed by the petitioner on appeal, all others are deemed waived. *See* Tenn. R. App. P. 27(a)(4), (7); *Harvey v. State*, 749 S.W.2d 478, 479 (Tenn. Crim. App. 1987).

established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State,* 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *See Henley v. State,* 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State,* 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *See Fields v. State,* 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *See Fields,* 40 S.W.3d at 458; *Burns v. State,* 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsels' performance was deficient and that counsels' deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *see State v. Taylor,* 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. 466 U.S. at 687. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697; *see also Goad v. State,* 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad,* 938 S.W.2d at 369 (citing *Strickland,* 466 U.S. at 688; *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. State of La.*, 350 U.S. 91, 101 (1955)).

Here, the thrust of the petitioner's appellate arguments are based on his theory that absent the deficiencies of trial counsel, evidence *could* have been presented showing someone else *could* have committed the crimes against the victim. His claims rest on his suggestion that Dr. Laboy and Dr. Piercey presented conflicting testimony as to the time it would take for the victim's injuries to manifest after the abuse.[3] However, no evidence exists in the record to support the petitioner's theory. Rather, the record makes clear the victim suffered acute, blunt force trauma prior to her death, and the petitioner was the only adult with the victim at the time she was injured. At trial, the petitioner attempted to put forth the theory that his eight-year-old son, who was also in the house at the time of the victim's injuries, *could* have injured the victim. However, as found by the post-conviction court, "not even a smidgen" of evidence exists supporting the petitioner's theory that his eight-year-old son was involved in injuring the victim. It is under this framework that we now address the specific allegations presented on appeal.

The petitioner makes two allegations concerning the State's expert medical witnesses and trial counsels' handling of the same. First, the petitioner argues trial counsels' failure to obtain an independent medical expert was unreasonable. The petitioner claims "[h]ad trial counsel sought an independent medical expert, that expert easily could have described the important differences between the two physicians' testimony, particularly with regard to the possible timing of when the victim's symptoms could have arisen following the injury." The petitioner argues "[t]his, in turn, would have allowed [p]etitioner to defend himself by raising the possibility that another person caused the victim's injuries." These claims are unsubstantiated in the record.

In order "[t]o succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *Black*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the

---

[3]The alleged discrepancy lies with Dr. Laboy's testimony that "it could be minutes to hours that someone would begin to show changes of the healing process" after suffering abuse like the victim's, while Dr. Piercey testified "in severe head trauma like [the victim's], the symptoms come on immediately, within seconds."

witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id.* The petitioner has not met his burden. At the post-conviction hearing, the petitioner failed to present any evidence to dispute the testimony of either Dr. Laboy or Dr. Piercey. *See id.* In fact, no evidence emerged suggesting that an expert witness even exists to dispute the evidence produced by the State at trial.

Rather, the evidence offered at the post-conviction hearing mirrors the medical proof produced at trial. After Dr. Laboy testified at the hearing, the post-conviction court stated:

> In regards to the medical testimony, Dr. Laboy was today as clear and unequivocal as he was on the day of trial. It may have been due to the [c]ourt's lack of medical background, however, Dr. Laboy and Dr. Piercey's testimony never appeared to be contradictory, but that they complimented each other. . . . Also, the [c]ourt could not imagine an expert anywhere that would or could have testified in this case that could have overcome the medical proof presented by the State's witnesses.

Therefore, no evidence exists regarding the alleged time discrepancy in the testimony of Dr. Laboy and Dr. Piercey as the petitioner failed to produce an expert to dispute the State's medical proof. Accordingly, the petitioner's claim is not supported by clear and convincing evidence and he cannot establish any resulting prejudice. *See Strickland,* 466 U.S. at 694; *Pylant*, 263 S.W.3d at 869. This argument is without merit.

The petitioner also claims trial counsel failed to properly cross-examine Dr. Laboy and Dr. Piercy by not questioning the experts on the alleged discrepancy in their testimony. However, as explained above, the evidence produced at the post-conviction hearing established no discrepancies exist in the testimony of Dr. Laboy and Dr. Piercey. After hearing testimony from trial counsel regarding their cross-examination strategy, the post-conviction court explained, "[the Public Defender] did not ask many questions during cross-examination, but he stopped when he should have stopped." We agree. The petitioner has failed to present clear and convincing evidence that trial counsels' cross examination of the State's expert witnesses reached the level of ineffective assistance of counsel as he failed to elicit evidence that a discrepancy in the experts' testimony even exists. As a result, the petitioner cannot prove that he was prejudiced by trial counsels' alleged failure to properly cross examine Dr. Laboy or Dr. Piercey. *See* Tenn. Code Ann. § 40-30-110(f); *Goad*, 938 S.W.2d at 369. The petitioner is not entitled to any relief as to this issue.

Regarding the petitioner's final allegation concerning trial counsel's failure to "correct false testimony" of the investigating officer at trial, we also find this claim to be meritless. The questioned testimony involves the investigating officer's statement

regarding the role the forensic interview of the petitioner's eight-year-old son played in eliminating him as a suspect in the victim's death. The post-conviction court held:

> The [c]ourt finds that [the investigating officer's] testimony was not misleading or false. The [c]ourt is not even sure that he misstated the forensic interview. The [c]ourt finds that there was not even a smidgen of evidence that the 8 year old brother, [the petitioner's son], had anything to do with the injuries that [the victim] sustained.

Again, the petitioner has failed to present evidence showing the investigating officer's testimony was false or misleading. At trial, the State presented expert medical testimony, testimony from the investigating officers, and testimony from the victim's mother establishing its timeline and theory of the case. The State's proffered testimony outlined that the victim suffered blunt force trauma prior to her death and that the petitioner was the only adult with the victim prior to her death. No evidence exists supporting the petitioner's theory that his eight-year-old son, or anyone else, *could* have injured the victim. Accordingly, we conclude that the petitioner has not established that trial counsel's failure to object to the alleged false testimony of the investigating officer prejudiced him in any way. He is not entitled to relief as to this issue.

After our review, we conclude the record is absent any evidence supporting the petitioner's claim that he was unable to present "a complete defense" at trial due to the alleged deficiencies of trial counsel. Accordingly, the petitioner has failed to show by clear and convincing evidence that counsels' performance prejudiced the outcome of the proceedings. *See Strickland,* 466 U.S. at 687. The petitioner is not entitled to post-conviction relief for his claim of ineffective assistance of counsel.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE

-11-